**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DEBRA HAGEN,<br>Plaintiff,<br>v.<br>HUNTERDON MEDICAL CENTER,<br>Defendant. | Civil Action No. 23-03748 (GC) (TJB)<br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Defendant Hunterdon Medical Center's Motion for Summary Judgment. (ECF No. 33.) Plaintiff opposed, and Defendant replied. (ECF Nos. 40, 41.) The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendant's Motion is **GRANTED**.

## I. BACKGROUND

### A. Factual Background[1]

Defendant is a non-profit hospital. (ECF No. 34 ¶ 1; ECF No. 40-1 ¶ 1.) Plaintiff worked for Defendant for 12 years over a 16-year period. (*See* ECF No. 34 ¶ 3; ECF No. 40-1 ¶ 3.) In

[1] On a motion for summary judgment, the Court "draws all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (citation modified). The factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' submissions in accordance with Local Civil Rule 56.1. Defendant's Statement of Undisputed Material Facts is at ECF No. 34 and Plaintiff's Response to Defendant's Statement of

March of 2020, Plaintiff began working for Defendant as a hospice nurse at Hunterdon Hospice, where she was responsible for "providing hands on direct patient care to the sickest of patients" in patients' homes. (ECF No. 34 ¶¶ 2, 4, 6; ECF No. 40-1 ¶¶ 2, 4, 6.) Hospice patients likely have six months or less to live. (ECF No. 34 ¶ 5; ECF No. 40-1 ¶ 5.)

### *1. COVID-19 Pandemic and Vaccine Development*

At the time Plaintiff began working as a hospice nurse, a global pandemic was declared due to COVID-19. (ECF No. 34 ¶ 7; ECF No. 40-1 ¶ 7.) Countries worldwide worked to produce a vaccine quickly, "given that vaccination was considered to be the ultimate protection against the spread of an infection which had resulted in almost 450,000 deaths in the United States by February 2021." (ECF No. 34 ¶ 9; ECF No. 40-1 ¶ 9.) In the United States, the Food and Drug Administration (FDA) gave emergency approval to three vaccines developed by Pfizer, Moderna, and Janssen (or J&J). (ECF No. 34 ¶¶ 10-11; ECF No. 40-1 ¶¶ 10-11.)

### *2. Vaccine Requirements and Guidance*

In late 2021, after the vaccines received emergency approval, the Centers for Medicare and Medicaid (CMS) required vaccination of all healthcare workers to limit the spread of COVID-19 and protect vulnerable populations served by those workers. (ECF No. 34 ¶ 12; ECF No. 40-1 ¶ 12.) This mandate was challenged in courts, but in January 2022 the Supreme Court ruled that CMS had not exceeded its statutory authority in issuing the mandate. (ECF No. 34 ¶ 13; ECF No. 40-1 ¶ 13.) The CMS mandate allowed for exemptions from its vaccine requirement, which is the basis of the dispute in this case. (ECF No. 34 ¶ 14; ECF No. 40-1 ¶ 14.) Defendant represents that the CMS mandate provided limited exemptions "for religious reasons and to accommodate

---

Undisputed Material Facts is at ECF No. 40-1. Unless otherwise noted, the relevant facts are undisputed or supported by record evidence.

cognizable medical disabilities that contraindicated vaccination." (ECF No. 34 ¶ 14.) Plaintiff represents that rather than allow limited exemptions, the CMS mandate instead "recognized that the civil rights laws exist and made very clear that the mandate did not supersede those laws," required employers to implement a process for civil rights laws to be enforced alongside this mandate, and recognized that some healthcare workers would be provided accommodations under civil rights laws. (ECF No. 40-1 ¶ 14.) Plaintiff asserts her "requests for accommodation turn on what the civil rights laws require." (*Id.*)

After the CMS vaccine mandate was upheld by the Supreme Court, Defendant required that all of its healthcare workers be vaccinated, except those who worked exclusively from home. (*See* ECF No. 34 ¶ 15; ECF No. 40-1 ¶ 15.) As of January 19, 2022, the Governor of New Jersey also required healthcare workers in New Jersey to receive the COVID-19 vaccination and a booster dose. (ECF No. 34 ¶ 16; ECF No. 40-1 ¶ 16; ECF No. 35-9 (N.J. Executive Order 283).) As such, Defendant's policy required both a vaccination and any available booster dose. (ECF No. 34 ¶ 17; ECF No. 40-1 ¶ 17.) Defendant concluded, after reviewing "evidence-based guidelines" from the Centers for Disease Control and Prevention (CDC), World Health Organization (WHO), the FDA, the Occupational Safety and Health Administration (OSHA), the National Institute of Allergy and Infectious Diseases (NIAID), and other organizations, that vaccines protected both the healthcare workers as well as the patients for whom they were providing care. (ECF No. 34 ¶ 18; ECF No. 40-1 ¶ 18.)

As part of its vaccine requirement, Defendant implemented a process through which healthcare workers could seek a religious or medical exemption. (ECF No. 34 ¶ 20; ECF No. 40-1 ¶ 20.) For religious exemptions, employees submitted their request to a committee, "which considered each individual application on its own merit taking into consideration the positions

each of the employees held in the organization and whether or not their positions involved direct patient care." (ECF No. 34 ¶ 22; ECF No. 40-1 ¶ 22.) The committee did not consider the sincerity of an employee's religious beliefs. (ECF No. 34 ¶ 30; ECF No. 40-1 ¶ 30.) Ninety-one requests for religious exemptions were submitted, and nine were granted. (ECF No. 34 ¶¶ 23-24; ECF No. 40-1 ¶¶ 23-24.)

For medical exemptions, employees submitted form applications to Defendant's Director of Occupational Health, Dr. David Christiansen. (ECF No. 34 ¶ 52; ECF No. 40-1 ¶ 52; ECF No. 35-11 ("Medical Exemption Statement for Health Care Personnel" filled out by Plaintiff).) Dr. Christiansen reviewed applications and determined exemptions based on CDC guidance regarding whether an employee experienced a medical contraindication. (ECF No. 34 ¶ 53; ECF No. 40-1 ¶ 53.) On its medical exemption request form, Defendant adopted the definition of contraindication provided by the CDC. (ECF No. 34 ¶ 60; ECF No. 40-1 ¶ 60.) The CDC defines contraindications as "conditions that indicate when vaccines should not be given" which include "[s]evere allergic reaction after a previous dose or to a vaccine component." (ECF No. 34 ¶ 60; ECF No. 40-1 ¶ 60; ECF No. 35-11 at 2.)[2] Plaintiff notes that there are other definitions of "contraindication" broader than that used by the CDC and adopted by Defendant. (ECF No. 40-1 ¶¶ 50, 62, 69.)

### *3. Plaintiff's Exemption Requests and Vaccination*

Plaintiff first sought a religious exemption. (ECF No. 34 ¶ 25; ECF No. 40-1 ¶ 25.) Defendant contends that Plaintiff requested a religious exemption based on her Christian beliefs that "precluded her from getting the vaccine because the vaccines were tested or developed in

---

[2] Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

some fashion using fetal stem cell lines." (ECF No. 34 ¶ 25.) Plaintiff asserts that Defendant mischaracterizes her religious beliefs and that she did not seek an exemption but rather a reasonable accommodation from the vaccine requirement. (ECF No. 40-1 ¶ 25.)

It is undisputed that Plaintiff's request was denied. (ECF No. 34 ¶ 29; ECF No. 40-1 ¶ 29.) It is also undisputed that Defendant's stated reason for this denial was because Plaintiff's job duties involved direct patient care. (ECF No. 34 ¶ 29; ECF No. 40-1 ¶ 29 ("Plaintiff does not dispute that this is the reason [Defendant] cited for denying her requests for accommodation (all of them)[.]").) Defendant represents that in cases like Plaintiff's, the committee concluded that:

> the duties [Defendant] had to its patients to protect them from the transmission of [COVID]-19 outweighed an individual employee's religious beliefs and that employees who refused vaccination for religious reasons posed an undue hardship on the organization because it adversely affected its infection control protocols, undermined the maximum efficacy of the vaccine mandate and jeopardized its ability to minimize staffing shortages caused by cluster breakouts of [COVID]-19.

(ECF No. 34 ¶ 31.) Plaintiff disputes this assertion, contending that Defendant "did accommodate some people, allowing them to use enhanced precautions, if their job was considered important enough." (ECF No. 40-1 ¶ 31.) Plaintiff maintains that Defendant would not have experienced an "undue hardship" had it accommodated Plaintiff, and that a finding of undue hardship is a question for the jury. (*Id.* ¶ 29.)

Defendant represents that it made the decision regarding Plaintiff's religious-based request "against the backdrop of already having had cluster infections in several departments which resulted in staffing shortages[.]" (ECF No. 34 ¶ 32.) It is undisputed that Defendant experienced COVID-19 outbreaks among its employees, and that Defendant tracked employee vaccination status and COVID-19 infection. (ECF No. 34 ¶¶ 32-33; ECF No. 40-1 ¶¶ 32-33.)

After her religious-based request was denied, Plaintiff received the J&J vaccine. (*See* ECF No. 34 ¶ 38; ECF No. 40-1 ¶ 38.) The J&J vaccine was one dose and was produced using fetal stem cell lines. (ECF No. 34 ¶ 39; ECF No. 40-1 ¶ 39.) Plaintiff has epilepsy as well as other medical conditions. (ECF No. 34 ¶ 42; ECF No. 40-1 ¶ 42.) Plaintiff had seizures in the past and her last seizure was in 2010. (ECF No. 34 ¶¶ 42-43; ECF No. 40-1 ¶¶ 42-43.) Within 48 hours of receiving the J&J vaccine, Plaintiff experienced "numbness, tingling and sciatic pain through the entire left leg which spread to her left arm, pain, numbness and tingling in her right leg, headaches, dizziness, severe fatigue and an inability to concentrate." (ECF No. 34 ¶ 45; ECF No. 40-1 ¶ 45.) Plaintiff also developed vertigo and memory issues. (ECF No. 34 ¶ 46; ECF No. 40-1 ¶ 46.) Plaintiff's neurologist, Dr. Manish Viradia, concluded that Plaintiff's symptoms that presented after receiving the J&J vaccine were a reaction to the vaccine despite Plaintiff's pre-existing medical conditions. (*See* ECF No. 34 ¶ 48; ECF No. 40-1 ¶ 48.) According to Plaintiff, Dr. Viradia told her she should not get any further COVID-19 vaccines because she was at risk of another adverse reaction. (ECF No. 40-1 ¶ 49; ECF No. 40-3 at 106:13-17.)[3]

In February 2022, Plaintiff requested a medical exemption from further vaccines or booster shots. (ECF No. 34 ¶ 51; ECF No. 40-1 ¶ 51.) Defendant states that Plaintiff "submitted a request for a medical exemption citing her adverse reaction to the vaccine." (ECF No. 34 ¶ 51.) Plaintiff disputes this assertion, stating that Plaintiff "requested an accommodation under the federal civil rights laws based on her neurological disabilities and neurological reaction to the [J&J] vaccine, but was required to complete the form provided by [Defendant] to do so." (ECF No. 40-1 ¶ 51.)

---

[3] Page numbers for citations to deposition transcripts refer to the internal page and line numbers stamped by the court reporter rather than the page numbers stamped by the Court's e-filing system.

The form Plaintiff filled out was labeled a "Medical Exemption Statement for Health Care Personnel." (*See* ECF No. 35-18.)

On Plaintiff's Medical Exemption Statement, Plaintiff's neurologist, Dr. Viradia, wrote "[r]eaction from 1st J&J vaccine given 1/26/2022" as the basis for the exemption. (ECF No. 35-18 at 2.) Dr. Christiansen reviewed Plaintiff's medical request. (ECF No. 34 ¶ 58; ECF No. 40-1 ¶ 58.) On February 6, 2022, Dr. Christiansen wrote to Plaintiff: "[p]lease be advised, your physician must state the nature of your reaction and how it is a contraindication to the vaccine. In addition, a reaction to the J&J vaccine does not preclude you from receiving an mRNA vaccine."[4] (ECF No. 35-20 at 3; ECF No. 34 ¶¶ 61-62; ECF No. 40-1 ¶¶ 61-62.) On February 17, 2022, Dr. Christiansen informed Plaintiff that she "must resubmit the Request for Medical Exemption with the Medical Exemption Statement from Dr. Viradia. He must state which vaccines are contraindicated and the medical contraindication for the vaccines." (ECF No. 35-20 at 2; ECF No. 34 ¶ 59; ECF No. 40-1 ¶ 59.)

On March 25, 2022, Plaintiff re-submitted her Medical Exemption Statement. (ECF No. 35-22 at 2, 5-7.) On the revised Statement, Dr. Viradia indicated that Plaintiff developed paresthesia following the vaccine shot, (*id.* at 5), and attached a letter which stated, "[Plaintiff] is under my care and had [a] reaction from COVID-19 vaccination,"[5] (*id.* at 7). Paresthesia is a

---

4 An mRNA vaccine is a type of vaccine, and the J&J vaccine Plaintiff received was not an mRNA vaccine. (*See* ECF No. 35-15 at 25, 28.) Reactions to a vaccine may differ depending on the type of vaccine. (*Id.* at 26-28; *see also* ECF No. 34 ¶¶ 40-41; ECF No. 40-1 ¶¶ 40-41.)

5 Defendant asserts that the "only medical support" Plaintiff provided for this request was the minimal notes from Dr. Viradia. (ECF No. 34 ¶ 54.) Plaintiff disputes this assertion, stating she "informed [Defendant] of her neurological disorders in September 2021." (ECF No. 40-1 ¶ 54.) In support of her assertion, Plaintiff relies on a 2021 email sent to Defendant as part of a separate November 2021 exemption request, in which she claims to suffer from "four separate neurological conditions." (ECF No. 35-13 at 4.) However, nothing in the record confirms

numbness and tingling sensation. (*See* ECF No. 34 ¶ 55; ECF No. 40-1 ¶ 55.) Plaintiff did not submit any additional notes from Dr. Viradia but did submit articles and studies. (ECF No. 34 ¶¶ 64-65; ECF No. 40-1 ¶¶ 64-65.) Defendant states that Plaintiff's paresthesia was temporary, and "her symptoms improved within a few months of receiving the [J&J] vaccine." (ECF No. 34 ¶ 57.) Plaintiff disputes that characterization and points to additional testimony from her deposition, stating that she still experiences tingling, dizziness, daily neuropathy in her legs, memory recall problems, and brain fog, and at the time of her deposition she was "75-80% improved[.]" (ECF No. 40-1 ¶ 57.) Dr. Christiansen reviewed Plaintiff's re-submitted medical request but denied it, stating that the "evidence is not provided to justify a medical exemption from the mRNA vaccines." (ECF No. 34 ¶ 67; ECF No. 40-1 ¶ 67; ECF No. 35-23 at 3.) Plaintiff subsequently resigned from her position. (ECF No. 34 ¶ 70; ECF No. 40-1 ¶ 70.) Plaintiff states that she chose to resign, rather than be terminated, so she could remain eligible for re-hire by Defendant. (ECF No. 40-1 ¶ 70.)

### B. Procedural Background

On July 13, 2023, Plaintiff filed a Complaint alleging religious discrimination for failure to accommodate and disparate treatment under Title VII, 42 U.S.C. § 2000e *et seq.* (Counts One and Two), religious and disability discrimination due to a failure to accommodate under the New Jersey Law Against Discrimination (NJLAD), N.J. Stat. Ann. § 10:5-1 *et seq.* (Counts Three and Four), intentional infliction of emotional distress (IIED) (Count Five), negligent infliction of emotional distress (NIED) (Count Six), and punitive damages (Count Seven).[6] (ECF No. 1.)

---

that this document was attached to Plaintiff's 2022 request forms. (ECF No. 35-18; ECF No. 35-11; *see also* ECF No. 35-22.)

[6] The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

Plaintiff seeks declaratory relief, damages, costs, and attorneys' fees. (*Id.* at 12.) The parties engaged in discovery and on February 6, 2026, Defendant filed a Motion for Summary Judgment. (ECF No. 33.) Defendant's Motion is fully briefed and ripe for review.

## II. <u>LEGAL STANDARD</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). The Court must grant summary judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995)).

## III. DISCUSSION

Defendant seeks summary judgment on all counts. (ECF No. 33.) The Court addresses the arguments for each count in turn.

### A. Religious Discrimination

#### *1. Failure to Accommodate (Counts One and Three)*

Both Title VII and the NJLAD make it unlawful for employers to discriminate on the basis of religion by failing to accommodate an employee's sincerely held religious beliefs. 42 U.S.C. § 2000e-2(a)(1); N.J. Stat. Ann. § 10:5-12(q)(1); *Shields v. Main Line Hosps., Inc.*, 700 F. Supp. 3d 265, 269 (E.D. Pa. 2023) ("Under Title VII, employees may assert two forms of religious discrimination: failure to accommodate and disparate treatment."); *Aliano v. Twp. of Maplewood*, Civ. No. 22-5598, 2023 WL 4398493, at *4 (D.N.J. July 7, 2023) ("[The] NJLAD has parallel provisions [to Title VII] for discrimination, failure to accommodate, and antiretaliation."). "Claims brought pursuant to NJLAD are assessed in the same way as claims under Title VII." *Aliano*, 2023 WL 4398493, at *4. As such, the Court will jointly analyze Plaintiff's Title VII and NJLAD religious discrimination claims.

Failure to accommodate claims are analyzed under a modified version of the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Clark v. U.S. Sec. Assocs., Inc.*, Civ. No. 06-1348, 2008 WL 11500370, at *3 (M.D. Pa. Feb. 11, 2008); *see also Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 281 n.12 (3d Cir. 2001). The framework in this context requires that the plaintiff first establish a *prima facie* case of religious discrimination, through which "the employee must show: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement." *Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009). After a *prima facie* case has been established, the

burden shifts to the employer to show that accommodating the plaintiff's religious belief "would work an undue hardship upon the employer." *Smith v. City of Atlantic City*, 138 F.4th 759, 774 (3d Cir. 2025) (quoting *Webb*, 562 F.3d at 259).

Undue hardship is a complete defense to religious discrimination claims. *Bushra v. Main Line Health, Inc.*, Civ. No. 24-1117, 2025 WL 1078135, at *2 (3d Cir. Apr. 10, 2025). "[A]n employer shows an undue hardship if the accommodation would create a burden that is 'substantial in the overall context of the employer's business.'" *Smith*, 138 F.4th at 774 (quoting *Groff v. DeJoy*, 600 U.S. 447, 468 (2023)) (considering religious discrimination under Title VII); *see also* N.J. Stat. Ann. § 10:5-12(q)(3)(a) (the NJLAD defining "undue hardship" in the religious discrimination context to mean that an accommodation would impose "unreasonable expense or difficulty" or "unreasonable interference with the safe or efficient operation of the workplace"). "'[U]ndue' means that the requisite burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level." *Groff*, 600 U.S. at 469. The analysis is "fact-specific" and "courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Id.* at 468, 470-71 (citation modified). "Undue hardship" in the context of religious accommodation in the Third Circuit includes both economic and non-economic costs, which "comports with the Supreme Court's emphasis on a context-specific inquiry[.]" *Bushra v. Main Line Health, Inc.*, 709 F. Supp. 3d 164, 175 (E.D. Pa. 2023), *aff'd*, Civ. No. 24-1117, 2025 WL 1078135 (3d Cir. Apr. 10, 2025). Although "undue hardship" may not be based on "mere speculation or conjecture," employers need not "wait until they feel the effects of the proposed accommodation before determining its reasonableness" and can consider the predictable consequences of an accommodation sought. *Miller v. Port Auth. of N.Y. & N.J.*, 351

F. Supp. 3d 762, 789 (D.N.J. 2018) (citation modified), *aff'd,* 788 F. App'x 886 (3d Cir. 2019). It is also "appropriate to consider aggregate effects when multiple employees are granted the same accommodation." *Cleckner v. 3M Co.*, Civ. No. 22-02055, 2025 WL 2524849, at *10 (M.D. Pa. Sep. 2, 2025) (citation modified).

Defendant does not challenge Plaintiff's *prima facie* case of religious discrimination. (*See* ECF No. 33 at 21-25.) Thus, the Court assumes that Plaintiff has established a *prima facie* case and the burden shifts to Defendant to demonstrate that accommodating Plaintiff would have caused an undue hardship. In its brief, Defendant argues that allowing Plaintiff to forego a COVID-19 vaccine would have: (1) posed significant risk to the patients she treated, and increased Defendant's risk of liability, (*id.* at 23-24); (2) placed Plaintiff's co-workers and Defendant's other employees at an increased risk of contracting COVID-19, and subjected Defendant to increased financial and operational harm if those employees could not work, (*see id.* at 24); and (3) would have "substantially increased the risk of a [COVID]-19 outbreak throughout [Defendant's] facilities," (*id.* at 24-25).

Defendant cites to the expert opinion of Dr. Daniel Salmon to support its undue hardship defense. (ECF No. 33 at 12 (citing ECF Nos. 35-15 and 35-16).) Dr. Salmon is the Director of the Institute for Vaccine Safety and a professor of Global Disease Epidemiology and Control, and he holds a PhD in Health Policy and Management. (ECF No. 35-15 at 2-3, 40.) Analyzing the time period of November 5, 2021—when CMS required vaccination of all healthcare workers, (ECF No. 34 ¶ 12; ECF No. 40-1 ¶ 12)—through April 14, 2022—when Plaintiff resigned from her position, (*see* ECF No. 35-2 at 34:16-25)—Dr. Salmon opined that "[h]ealthcare personnel were at increased risk of contracting and transmitting COVID-19 because of their occupational exposure" and "healthcare workers who come into contact with patients who are at increased risk

of severe COVID-19 due to risk factors such as age and underlying health conditions would be particularly concerning," (ECF No. 35-15 at 6, 8, 9). "Homebound hospice patients were particularly at high risk [for COVID-19] because of their age and/or underlying medical condition making them at high risk for severe disease and death." (*Id.* at 7; *see also id.* at 14.) Dr. Salmon concluded that "[v]accination of healthcare workers has been shown to be very effective, with minimal adverse effects, and shown to reduce patient mortality." (*Id.* at 15.) Vaccinated persons were less likely to contract COVID-19 than unvaccinated persons, (*id.* at 36), and "[u]sing real world data among frontline workers between December 14, 2020–August 14, 2021 (Delta Wave), full vaccination with COVID-19 vaccines was 80% effective in preventing COVID-19," (*id.* at 10-11). While alternative strategies for disease prevention like mask wearing, social distancing, and regular testing were also somewhat effective, "they were difficult to implement consistently, and the highest level of protection was achieved by layering protections including vaccination." (*Id.* at 38.) As to Plaintiff specifically, Dr. Salmon testified that: "[i]f [Plaintiff] had -- was wearing a mask and was testing but not boosted, and you compared her to somebody who was also wearing a mask and being tested and was boosted, she would have a higher risk of acquiring and transmitting disease." (ECF No. 35-16 at 125:21-25.)

Plaintiff has offered no evidence to rebut Dr. Salmon's opinion.[7] Instead, Plaintiff argues that "it is hard to pin down exactly what [Defendant] claims would constitute the hardship" when

[7] In her Response to Defendant's Statement of Undisputed Material Facts, Plaintiff makes cursory objections to Dr. Salmon's expert opinions, stating that they are "untethered to objective scientific data and, to the extent it is admissible, is subject to impeachment on cross-examination." (ECF No. 40-1 ¶¶ 36-37.) Plaintiff has not filed a separate *Daubert* motion challenging Dr. Salmon's expert qualifications or the reliability of his opinions. As such, the Court need not consider this argument. *Brown v. Smith*, Civ. No. 20-8463, 2023 WL 120458, at *9 n.7 (D.N.J. Jan. 5, 2023) ("This argument was not raised properly or briefed; therefore, the Court will not consider it."); *United States v. Jasin*, 292 F. Supp. 2d 670, 681 (E.D. Pa. 2003) ("[A]bsent a request

comparing the arguments set forth in Defendant's present Motion versus Defendant's 2022 decision denying Plaintiff's requested accommodation. (ECF No. 40 at 13.) According to Plaintiff, Defendant's 2022 denial provided "*no* contemporaneous evidence that [Defendant] decided that it would be an undue hardship to accommodate [Plaintiff] based on any financial cost, administrative impracticality, or disruption to its conduct of business." (*Id.* at 13 (emphasis in original).) Plaintiff's argument is unavailing, as there is no genuine dispute of fact that Plaintiff's requested accommodation would have caused an undue hardship on Defendant.

First, Plaintiff does not dispute that her role as a hospice nurse "involved the direct provision of patient care" and that was "the reason [Defendant] cited for denying her requests for accommodation." (ECF No. 34 ¶¶ 4, 29; ECF No. 40-1 ¶¶ 4, 29.) In 2022, it was Defendant's position that "any unvaccinated person was a potential harm to a patient" due to the "widely known fact that an unvaccinated person could acquire the infection and transmit it to others." (ECF No. 35-10 at 51:11-19.) It is undisputed that Defendant concluded, based on "evidence-based guidelines" from several public health organizations such as the CDC, WHO, FDA, OSHA, and NIAID, that vaccines protected healthcare workers and their patients. (ECF No. 34 ¶ 18; ECF No. 40-1 ¶ 18.)

Non-economic costs, such as harm to patients or other employees, can establish an undue hardship. *See Bushra*, 709 F. Supp. 3d at 175. Numerous courts have found "the possibility of an unvaccinated individual getting others sick [is] a non-speculative risk that a court may consider when performing an undue hardship analysis." *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1136 (C.D. Cal. 2023), *aff'd,* Civ. No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025)

---

from the parties, a district court has no obligation to make explicit on-the-record rulings concerning *Daubert* issues.").

(collecting cases); *see also Hall v. Sheppard Pratt Health Sys., Inc.*, 155 F.4th 747, 753 (4th Cir. 2025) ("And we agree with other circuits that have concluded, after *Groff*, that non-economic costs can also include threats to the health and safety of employees and the people they serve." (collecting cases)). It is undisputed that at the time Defendant denied Plaintiff's request, Defendant had experienced "infection clusters in the nursing staff which resulted in departmental scheduling shortages and unnecessary organizational burdens." (ECF No. 35-14 at 3; ECF No. 40-1 ¶ 32 ("Undisputed that [Defendant] experienced [COVID-19] outbreaks among staff of all vaccination statuses.").) Other courts have found that employers with "community-critical" missions, like firefighters or healthcare providers, would face a serious operational burden if they allowed unvaccinated employees to work, as those employees put the health of other employees at risk and such a critical employer "could not afford to have substantial numbers of its [employees] on sick leave" as that would lead to "potentially severe limits on EMS and firefighting responses in the community." *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1220 (9th Cir. 2025), *petition for cert. filed*, (U.S. Apr. 23, 2026) (No. 25-1210); *see also Hall*, 155 F.4th at 753 ("Other lower courts have agreed that the undue hardship of having unvaccinated employees is particularly acute in a health care setting, where the employer's business involves the protection of lives." (citation modified)).

In terms of economic considerations, while temporary labor costs do not *per se* constitute an undue burden, the absence of healthcare workers or a COVID-19 outbreak in a healthcare facility has been found to impose significant financial costs on employers and the local community. *See Petersen*, 150 F.4th at 1221. Also, Defendant would have been subject to "fines or other legal consequences" if it violated federal or state vaccination mandates by allowing employees to be unvaccinated, thereby increasing its risk of liability and financial harm. (ECF No. 40-8 at 66:2-19.)

*Petersen*, 150 F.4th at 1221-22 (holding that economic costs are not limited to "realized hardships" and can include calculation of potential risk, such as the cost of potential lawsuits regarding COVID-19 transmission).

Plaintiff next argues that accommodating Plaintiff would not have posed any undue hardship because Defendant *did* grant religious exemptions to some employees with patient-facing roles, thus rendering Defendant's undue hardship argument pretextual. (ECF No. 40 at 16.) In support, Plaintiff cites to the testimony of one of Defendant's own employees who confirmed that accommodations for patient-facing employees were granted in circumstances "when the skill set of the involved person was essential and could not be reproduced by any other staff member." (*Id.* (citing ECF No. 40-5 at 58:5-24).) However, Plaintiff offers no further evidence regarding the circumstances of these accommodated employees, such as the positions they held or services they provided to adequately compare them to Plaintiff. Plaintiff also offers no evidence regarding whether her skill set was "essential and could not be reproduced."

Defendant provides a spreadsheet demonstrating that ninety-one employees made religious exemption requests and nine were granted. (ECF No. 35-12 (Spreadsheet); ECF No. 40-1 ¶¶ 23-24.) However, neither party identifies the specific positions or skills of these employees except for some notes indicating whether the employees worked hybrid or in a remote setting. (*See* ECF No. 35-12 at 116, 122, 128.) The Court cannot reasonably infer from this spreadsheet alone that Defendant accommodated similarly situated employees and thus would not have suffered an undue hardship had it accommodated Plaintiff. *Bushra*, 2025 WL 1078135, at *2 ("[The plaintiff's] assertion that an unknown number of unnamed employees received unidentified accommodations does not rebut [the defendant's] substantial evidence that it could not accommodate him."); *see also Allbright v. S. Cal. Permanente Med. Grp. Inc.*, 793 F. Supp. 3d

1214, 1229 (C.D. Cal. 2025), *appeal dismissed sub nom. Allbright v. S. Cal. Permanente Med. Grp.*, Civ. No. 25-5426, 2025 WL 4354257 (9th Cir. Dec. 29, 2025) (holding that "without any information regarding the duties and tasks of other employees granted accommodations, and whether such duties and tasks were similar to [the p]laintiff's, the [c]ourt cannot conclude that [the employer] accommodated similarly situated staff").

Finally, Plaintiff argues that Defendant's undue burden argument "rests on a sleight of hand" because Plaintiff is "fully vaccinated," and Defendant "has not provided any evidence or information showing that it would have been an undue hardship to allow a fully vaccinated worker to continue working." (ECF No. 40 at 14.) Plaintiff's argument misses the mark. Plaintiff does not dispute that Defendant's policy required both "vaccination and any available booster doses," and that she never received a booster. (ECF No. 40-1 ¶ 17.) Regardless of how one defines "fully vaccinated," Dr. Salmon opined that "boosters reduced the risk of COVID-19 infections. As a result, unboosted individuals were at greater risk than boosted persons in contracting and transmitting disease to others." (ECF No. 35-15 at 14.) Plaintiff offers no contrary evidence. Further, Dr. Salmon explained that "there were recommendations for booster doses, and once those recommendations became implemented, some would define fully vaccinated as boosted, as well." (ECF No. 41-2 at 38:9-12.) And contrary to Plaintiff's argument, Defendant considered alternatives to vaccination as Dr. Salmon opined that "[i]n healthcare settings, masking, social distancing and periodic testing were helpful but insufficient absent vaccination." (ECF No. 35-15 at 22; *see also* ECF No. 35-19 at 32:1-10 (Defendant's employee testimony that "individually [accommodations] were reviewed for individuals in a non-patient care area . . . but we felt that it was too grave a risk for anyone in a patient care capacity").)

Because Defendant has presented substantial evidence of undue hardship and Plaintiff has failed to provide "actual evidence in the record on which a jury could decide an issue of fact [her] way," summary judgment must be granted for Defendant. *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007); *see also Bushra*, 2025 WL 1078135, at *2 (affirming summary judgment for defendant on failure to accommodate claim because defendant demonstrated undue hardship and the plaintiff did not offer evidence to rebut the defense); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, Civ. No. 19-5734, 2022 WL 507479, at *8 (E.D. Pa. Feb. 18, 2022) (granting summary judgment for defendant on failure to accommodate claim because defendant demonstrated undue hardship and the plaintiff offered no evidence to refute undue hardship defense); *Munroe v. Bos. Med. Ctr.*, 790 F. Supp. 3d 52, 61 (D. Mass. 2025) (granting summary judgment for defendant employer where "plaintiff has not raised a genuine dispute of material fact as to whether granting an exemption to the vaccine mandate would cause an undue hardship to defendant.").

### *2. Disparate Treatment (Count Two)*

Plaintiff also brings a religious discrimination claim under Title VII on a theory of disparate treatment. (ECF No. 1 ¶¶ 32-38.) "Claims of disparate treatment due to religious discrimination under Title VII are subject to the familiar *McDonnell*[-*Douglas*] burden shifting analysis." *Saunders v. Apothaker Assocs., Inc.*, Civ. No. 10-3170, 2012 WL 1332602, at *2 (D.N.J. Apr. 17, 2012), *aff'd sub nom. Saunders v. Apothaker & Assocs., Inc.*, 556 F. App'x 98 (3d Cir. 2014). The analysis requires:

> First, [the p]laintiff must state a prima facie case. Next, the burden shifts to [the d]efendants to articulate some legitimate, non-discriminatory reason for the employee's termination. If [the d]efendants succeed, [the p]laintiff may still avoid summary judgment by offering evidence that [the d]efendants' proffered reason was merely a pretext for the termination.

*Id.* (internal citations omitted). The *prima facie* case in this context requires that Plaintiff show "(1) that she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Gray v. Main Line Hosps., Inc.*, 717 F. Supp. 3d 437, 449 (E.D. Pa. 2024). "The bar to establish a *prima facie* case of employment discrimination is 'low.'" *Lynn v. Bank of N.Y. Mellon*, Civ. No. 22-4655, 2025 WL 907898, at *9 (D.N.J. Mar. 25, 2025) (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006)).

Defendant does not contest that Plaintiff satisfies the first and third prongs of a *prima facie* case. Instead, Defendant argues that Plaintiff was not qualified for her position because she would not get a COVID-19 vaccine booster (second prong), nor has Plaintiff shown that the circumstances of her termination give rise to an inference of discrimination (fourth prong). (ECF No. 33 at 29-30.) Defendant argues in the alternative that, even if the Court were to find Plaintiff established a *prima facie* case, it is still entitled to summary judgment as it has shown a legitimate, non-discriminatory reason for terminating Plaintiff. (*Id.* at 30-31.) In opposition, Plaintiff does not specifically respond to Defendant's arguments regarding her *prima facie* case but instead argues that summary judgment must be denied because she has shown that Defendant's reason for terminating her was pretextual as Defendant accommodated other employees. (ECF No. 40 at 20-21.)

The Court agrees with Defendant that Plaintiff has failed to satisfy the second prong of the *prima facie* case, that she was qualified for her position. It is undisputed that Defendant, pursuant to New Jersey Executive Order 283 and the CMS mandate, required its healthcare workers to receive an initial COVID-19 vaccination and a booster dose. (ECF No. 40-1 ¶¶ 13, 15-17.)

"Imposing a vaccination requirement is a lawful condition of employment, especially in the healthcare field." *Auteri v. Via Affiliates*, Civ. No. 22-3384, 2024 WL 3729860, at *6 (E.D. Pa. Aug. 8, 2024). In cases considering similar laws and employer policies, courts have held that "[t]o be qualified to perform the essential duties of her job, [the plaintiff] would have had to have been vaccinated for COVID-19 or qualify under a recognized exemption under the vaccine mandate." *Rodriguez v. Wellspan Philhaven*, Civ. No. 23-00698, 2025 WL 1710052, at *5 (M.D. Pa. June 18, 2025).[8] Courts have found that employees who fail to comply with such requirements are not qualified to perform the essential duties of their jobs because they are not in compliance with the mandate and therefore have not made out a *prima facie* case of discrimination. *Id.*

For example, in *Tandian v. State University of New York*, the court explained that a state law requiring patient-facing healthcare workers to be vaccinated unless they received an exemption "changed [the p]laintiff's job requirements to include that she must be vaccinated with one of the COVID-19 vaccines." 698 F. Supp. 3d 425, 438-39 (N.D.N.Y. 2023). Thus, "to be qualified for her position as a [healthcare worker], [the p]laintiff must have been vaccinated against COVID-19 or received a medical exemption; it is undisputed that she did neither." *Id.* at 439. The court ultimately found that due to the plaintiff's failure to receive a vaccination or exemption, "she has not alleged that she was qualified for her position when she was terminated in June of 2022" and had not alleged a *prima facie* case of religious discrimination. *Id.* Plaintiff cites no cases holding otherwise. As such, the Court holds that in light of the vaccine and booster requirement,

---

[8] The *Rodriguez* court analyzed whether the plaintiff was "qualified to perform the essential functions of the job" under the ADA, not Title VII. 2025 WL 1710052, at *5. However, this analysis remains instructive because "[t]he elements of 'performing the essential functions of the job' for purposes of establishing an ADA claim and being 'qualified for her job' for purposes of establishing a Title VII discrimination claim' are similar, and courts have treated them as interchangeable." *Nortey v. St. John Med. Ctr. Inc.*, Civ. No. 19-523, 2021 WL 4978532, at *5 (N.D. Okla. Oct. 26, 2021), *aff'd*, Civ. No. 21-5084, 2022 WL 3268355 (10th Cir. Aug. 11, 2022).

and Plaintiff's failure to receive a booster or an exemption, she was not qualified for her position. As such, Plaintiff cannot satisfy the second prong and make out a *prima facie* case of discrimination.

Even if the Court were to hold otherwise, Plaintiff has also failed to satisfy the fourth prong, that the adverse action occurred under circumstances that could give rise to an inference of intentional discrimination. Defendant argues that "[t]he record is devoid of any evidence demonstrating that Plaintiff's termination was motivated by those religious beliefs" and instead, the record shows that Defendant "evaluated all religious exemption[] requests under the same criteria." (ECF No. 33 at 30.) The record supports Defendant's argument.

"To raise an inference of discriminatory action, [a plaintiff] must plead facts showing 'some causal nexus between [her] membership in a protected class' and the adverse employment action." *Slater v. Yellen*, Civ. No. 21-2763, 2022 WL 20742521, at *4 (E.D. Pa. Aug. 22, 2022), *aff'd*, Civ. No. 23-1091, 2023 WL 6457818 (3d Cir. Oct. 4, 2023) (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003)). A plaintiff may support an inference of discrimination "in a number of ways, including, but not limited to, comparator evidence, evidence of similar [] discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting [discriminatory] animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010). Plaintiff offers little besides the general statement that Defendant did accommodate "some people . . . if their job was considered important enough." (ECF No. 40-1 ¶ 31; ECF No. 40 at 20-21.) As discussed previously, this statement—supported only by vague testimony from one of Defendant's employees—offers no detail as to these accommodated employees and does not indicate whether they were similarly situated to Plaintiff. In another case where a healthcare worker subject to a COVID-19 vaccination policy alleged she received

disparate treatment when her religious exemption request was denied, the court also found the plaintiff failed to make out a *prima facie* case under this fourth prong because "[the p]laintiff [did] not identify any group that was treated more favorably than [the p]laintiff—which is the essence of a disparate treatment claim—based on religion" and granted summary judgment for the defendant. *See Gray*, 717 F. Supp. 3d at 449-50. The same is true in the present matter; the evidence before the Court does not permit an inference of intentional discrimination and Plaintiff has not satisfied the fourth prong of a *prima facie* case of intentional discrimination.

Because Plaintiff has failed to establish a *prima facie* case, the Court need not address the arguments regarding the next steps in the *McDonnell-Douglas* burden-shifting framework. Summary judgment must be granted for Defendant on this claim. *Stinson v. Triple Canopy, Inc.*, Civ. No. 21-4557, 2023 WL 4763993, at *6 (E.D. Pa. July 26, 2023) ("As [the p]laintiff cannot meet his burden at the initial *prima fac[i]e* stage, the Court will grant summary judgment on his religious discrimination claims."); *see also El Bey v. Robert Wood Johnson Univ. Hosp.*, Civ. No. 15-2537, 2018 WL 2926168, at *6 (D.N.J. June 11, 2018) ("[I]t is [the p]laintiff's initial burden to establish a *prima facie* case of religious discrimination.").

**B. Disability Discrimination (Count Four)**

Plaintiff brings a claim for disability discrimination under the NJLAD for failure to accommodate her disability.[9] (ECF No. 1 ¶¶ 44-49.) The NJLAD prohibits discrimination against

9 In her brief, Plaintiff argues that Defendant discriminated against Plaintiff by failing to accommodate her disability as is required by the NJLAD and the ADA. (ECF No. 40 at 16.) However, Plaintiff's Complaint only raises a disability discrimination claim under the NJLAD, not the ADA. (ECF No. 1 ¶¶ 44-49.) As such, the Court will not consider any of Plaintiff's claims as brought under the ADA but will consider the cases cited by Plaintiff considering disability discrimination claims brought under the ADA, as "the elements of a claim of failure to reasonably accommodate under NJLAD are the same as the elements required for such a claim under the ADA." *Byrne v. Monmouth Cnty. Dep't of Health Care Facilities*, Civ. No. 06-5184, 2008 WL 11406176, at *6 (D.N.J. Mar. 11, 2008), *aff'd*, 372 F. App'x 232 (3d Cir. 2010).

disabled persons. N.J. Stat. Ann. §§ 10:5-4.1, 10:5-29.1; N.J. Admin. Code § 13:13-2.5(b). "Under the NJLAD, there are two distinct categories of disability discrimination claims, namely (1) failure to accommodate an employee's disability; and (2) disparate treatment." *Pailleret v. Jersey Constr., Inc.*, Civ. No. 09-1325, 2011 WL 1485402, at *7 (D.N.J. Apr. 19, 2011) (citation modified). While the statute itself "does not specifically address reasonable accommodation, our courts have uniformly held that the [NJLAD] nevertheless requires an employer to reasonably accommodate an employee's handicap." *Victor v. State*, 952 A.2d 493, 501 (N.J. App. Div. 2008), *aff'd as modified,* 4 A.3d 126 (N.J. 2010) (citation modified).

Failure to accommodate claims under the NJLAD proceed under a burden-shifting framework. *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 848 (3d Cir. 2016). First, a plaintiff must establish a *prima facie* case of disability discrimination by showing that: "(1) plaintiff was handicapped or disabled within the meaning of the statute; (2) plaintiff was qualified to perform the essential functions of the position of employment, with or without accommodation; [and] (3) plaintiff suffered an adverse employment action because of the handicap or disability[.]" *Victor*, 952 A.2d at 501, 502. Making out a *prima facie* case creates a presumption of discrimination. *Tourtellotte*, 636 F. App'x at 848. After a qualified individual with a disability has made a request for an accommodation, "the employer has a responsibility to engage the employee in the interactive process of finding accommodations." *Bertolotti v. AutoZone, Inc.*, 132 F. Supp. 3d 590, 602 (D.N.J. 2015) (citation modified).

Failure to participate in the interactive process requires a showing that: "(1) [the plaintiff's] employer knew of her disability; (2) the plaintiff requested accommodations or assistance for her disability; (3) the employer made no good faith effort to assist; and (4) that plaintiff could have been reasonably accommodated but for the employer's lack of good faith." *Fitzgerald v. Shore*

*Mem'l Hosp.*, 92 F. Supp. 3d 214, 237 (D.N.J. 2015); *see also Tourtellotte*, 636 F. App'x at 849. The burden then shifts to the employer "to demonstrate that a reasonable accommodation cannot be provided to the disabled employee," and "[i]f the proposed reasonable accommodation would impose an undue hardship on the employer, then the employer does not have to accommodate the employee." *Dennis v. County of Atlantic County*, 863 F. Supp. 2d 372, 380 (D.N.J. 2012).

Defendant argues that summary judgment is warranted because Plaintiff is not disabled under the NJLAD and therefore cannot make out a *prima facie* case and, in the alternative, Defendant was not required to accommodate Plaintiff because such accommodation would cause undue hardship. (ECF No. 33 at 25-28.) Even if Plaintiff has established a *prima facie* case of disability discrimination, the Court determines that summary judgment is warranted in Defendant's favor because accommodating Plaintiff would have caused an undue hardship on Defendant.

"An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer"; in other words, "the process must be interactive because *each party* holds information the other does not have or cannot easily obtain." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312, 316 (3d Cir. 1999) (citation modified). However, "the employer will almost always have to participate in the interactive process to some extent before it will be clear that it is impossible to find an accommodation that would allow the employee to perform the essential functions of a job." *Id.* at 317; *see also Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 700 (E.D. Pa. 2010) ("Once an employee has requested an accommodation, the employer has a duty to engage in an 'interactive process' aimed at designing a reasonable accommodation for the employee's disability, if possible."). "If, after engaging in the interactive process, an employer refuses to provide the requested accommodations, the employer must show that acquiescing would have caused an 'undue hardship.'" *Ward v. D.C.*,

211 F. Supp. 3d 58, 66 (D.D.C. 2016); *see also Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, 141 F.4th 568, 574 (4th Cir.), *cert. denied sub nom.*, 146 S. Ct. 367 (2025) ("The interactive process helps employers to discharge their duty to accommodate. Largely, that means giving employers and employees a chance to work together to figure out what accommodation, if any, would be reasonable and not unduly burdensome."). There is no bright-line requirement for how employers may demonstrate good faith engagement in the interactive process, but the Third Circuit has held that good faith may be found when employers "meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor*, 184 F.3d at 317.

The accommodation at issue is Plaintiff's February 2022 medical exemption request from Defendant's vaccine requirement.[10] (*See* ECF No. 40-1 ¶ 51.) Dr. Viradia wrote "[r]eaction from 1st J&J vaccine given 1/26/2022," as the basis for Plaintiff's request for a medical exemption.[11]

[10] Plaintiff argues that Defendant classified her request as an "exemption" rather than an "accommodation" to circumvent legal requirements to provide accommodations for disabled employees. (*See* ECF No. 40 at 17.) This is unpersuasive. "Requests for accommodation are not restricted to written requests, nor must they cite to the law or use the phrase 'reasonable accommodation.'" *Taylor v. Lincare, Inc.*, Civ. No. 15-6284, 2016 WL 3849852, at *5 (D.N.J. July 15, 2016). Furthermore, courts in this district have construed requests for exemptions from vaccine requirements as accommodations for disability. *See, e.g.*, *Klemmer v. MGM Resorts Int'l, Inc.*, Civ. No. 22-7363, 2024 WL 2022748, at *1 (D.N.J. May 7, 2024) ("[The p]laintiff requested an accommodation under the Americans with Disabilities Act ('ADA') that would exempt her from [the defendant's] vaccine mandate.").

[11] Plaintiff represents that she requested this accommodation due to her epilepsy and neurological conditions. (ECF No. 40 at 17-18, 20; ECF No. 40-1 ¶ 51.) In support, Plaintiff cites her own testimony that she "had written a letter talking about my medical risk, and [Defendant] sent me the form for the medical exemption." (ECF No. 40-3 at 86:11-15.) However, no such exchange appears in the record, and Defendant disputes this assertion, arguing that Plaintiff

(ECF No. 35-18 at 2.) The subsequent correspondence between Plaintiff and Dr. Christiansen discussing Plaintiff's accommodation request reflect Defendant's good faith effort to engage in the interactive process. Soon after Plaintiff first submitted her Medical Exemption Statement, on February 6, 2022, Dr. Christiansen wrote to Plaintiff: "[p]lease be advised, your physician must state the nature of your reaction and how it is a contraindication to the vaccine. In addition, a reaction to the J&J vaccine does not preclude you from receiving an mRNA vaccine." (ECF No. 35-20 at 3.) On February 17, 2022, Plaintiff responded, asserting that she has a "significant history of neurological problems" and would provide a letter from her neurologist, Dr. Viradia. (*Id.* at 2-3.) Dr. Christiansen responded that same day and informed Plaintiff that she "must resubmit the Request for Medical Exemption with the Medical Exemption Statement from Dr. Viradia. He must state which vaccines are contraindicated and the medical contraindication for the vaccines." (*Id.* at 2.)

On March 25, 2022, Plaintiff again emailed Dr. Christiansen, submitting her revised Medical Exemption Statement. (ECF No. 35-22 at 2, 5-7.) On the revised Statement, Dr. Viradia noted: "[Plaintiff] developed [paresthesia] following the vaccine shot." (*Id.* at 5.) Plaintiff also attached to the form a short letter from Dr. Viradia, which stated, "[Plaintiff] is under my care and had [a] reaction from COVID-19 vaccination." (*Id.* at 7.) In her email to Dr. Christiansen, Plaintiff stated "[u]nfortunately, as I am sure you are aware, [my neurologist] is very limited as to what he can write without the state coming after his license." (*Id.* at 2.) In an email dated April 12, 2022, Dr. Christiansen acknowledged Plaintiff's submission of additional articles to support her exemption request but ultimately denied Plaintiff's request, writing that the revised Statement

---

requested an accommodation solely for her adverse reaction to the first vaccine dose. (*See* ECF No. 33 at 26.)

"does not meet the requirements for a medical exemption, provided to us in guidance from the Centers for Medicare and Medicaid services (CMS)" and "evidence is not provided to justify a medical exemption from the mRNA vaccines." (ECF No. 35-23 at 3.)

Also in the record is an undated document Plaintiff drafted in support of her request for an exemption. (ECF No. 35-27 at 2; ECF No. 35-2 at 116:17-20.) The document includes a signature line for Dr. Viradia, (ECF No. 35-27 at 2), and Plaintiff testified that the document is what she wanted him to submit in support of her exemption request, (ECF No. 35-2 at 117:2-7). It states "I have been treating [Plaintiff] for multiple neurological conditions throughout the years and it is my recommendation that she does not receive ***any*** additional [COVID-19] vaccine boosters as her neurologic status is at heightened risk due to this recent demeyelination response [to the J&J vaccine she received]." (ECF No. 35-27 at 2 (emphasis in original).) However, Dr. Viradia never signed or submitted this statement, (ECF No. 35-2 at 116:21-117:7), instead, he only wrote that Plaintiff: had a "[r]eaction from 1st J&J vaccine given 1/26/2022," (ECF No. 35-18 at 2), "developed [paresthesia] following the vaccine shot," (ECF No. 35-22 at 5), and "had [a] reaction from COVID-19 vaccination," (*id.* at 7).

In his correspondence with Plaintiff, Dr. Christiansen demonstrated a good faith engagement in the interactive process by requesting information about her condition and allowing Plaintiff multiple opportunities to submit more information as part of her request. *See Taylor*, 184 F.3d at 317. Separately, Dr. Christiansen spoke with Defendant's clinical pharmacy team as well as the CDC directly for guidance regarding medical exemption requests and whether neurological symptoms required a vaccine exemption. (ECF No. 35-24; ECF No. 35-26.) Where evidence "indicates that defendant communicated with plaintiffs, followed up for additional information as needed, and rendered individualized decisions on accommodations in accordance with CDC

guidelines," courts have found an employer engaged in the interactive process. *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 438-39 (D. Mass. 2021), *aff'd,* 32 F.4th 82 (1st Cir. 2022). Plaintiff does not dispute Dr. Christiansen's correspondence with her or with the CDC. (*See* ECF No. 40-1 ¶¶ 58-68.)

Because there is no genuine dispute of material fact that Defendant engaged in the interactive process, the burden shifts to Defendant to demonstrate that accommodating Plaintiff would have posed an undue hardship. Defendant has satisfied this burden. It is well-established that an employer may conclude, after engaging in the interactive process, that no reasonable accommodation is possible. *See, e.g.*, *Taylor*, 184 F.3d at 317-18; *Bernhard*, 720 F. Supp. 2d at 700; *Ward*, 211 F. Supp. 3d at 66; *Tarquinio*, 141 F.4th at 574. The NJLAD does not explicitly define "undue hardship," in the disability discrimination context but the ADA comparatively defines it to mean "significant difficulty or expense." *Gould v. N.J. Dep't of Transp.*, Civ. No. A-1164-23, 2025 WL 1165847, at *9 (N.J. Super. Ct. App. Div. Apr. 22, 2025) (citation modified). In the disability discrimination context, "undue hardship" is a higher bar than "undue hardship" as considered in the context of religious discrimination. *Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564, 599 (W.D. Pa. 2009) ("Courts have recognized that Title VII's religious accommodation requirement is not as demanding as the accommodation requirement provided to disabled employees and applicants under the ADA."); *see also Hall*, 155 F.4th at 752 (noting that the ADA employs a "more stringent definition of undue hardship" and "employers can more easily show undue hardship when considering religious-accommodation requests under Title VII than when considering medical-accommodation requests under the ADA"). Under the NJLAD:

> In determining whether an accommodation would impose undue hardship on the operation of an employer's business, factors to be considered include:

> i. The overall size of the employer's business with respect to the number of employees, number and type of facilities, and size of budget;
>
> ii. The type of the employer's operations, including the composition and structure of the employer's workforce;
>
> iii. The nature and cost of the accommodation needed, taking into consideration the availability of tax credits and deductions and/or outside funding; and
>
> iv. The extent to which accommodation would involve waiver of an essential requirement of a job as opposed to a tangential or non-business necessity requirement.

N.J. Admin. Code § 13:13-2.5(3).

Defendant argues that Plaintiff's medical exemption would have caused the same undue hardship that served as the basis for denying Plaintiff's request for a religious exemption—"exposure to liability, increased risk of spread, staffing costs, and personal protective equipment usage, and implementation of additional safety protocols, all while still failing to eliminate the heightened risk to patients." (ECF No. 33 at 27-28.) Plaintiff makes the same arguments regarding undue hardship in the context of her disability discrimination claim (ECF No. 40 at 12 (arguing Defendant's Motion should be denied for Counts One through Four))—*i.e.*, that the evidence does not show that Defendant denied Plaintiff's accommodation in 2022 because of undue hardship, (*id.* at 13-15), Plaintiff was "fully vaccinated" and it would not have been an undue hardship to allow her to work, (*id.* at 14), and Defendant's grant of accommodations to others demonstrates that accommodating Plaintiff would not have posed an undue hardship, (*id.* at 16). The Court finds that there is no genuine dispute of fact that Plaintiff's disability accommodation request would have posed an undue hardship, thereby entitling Defendant to summary judgment.

Courts have previously held that requiring a disability exemption in response to a COVID-19 vaccination policy would have imposed an undue hardship on an employer. In

*Together Employees v. Massachusetts General Brigham Inc.*, the court denied a preliminary injunction that would enjoin the defendants from enforcing their COVID-19 vaccination policy in part because the defendant, who operated medical facilities, had "established a likelihood of success on its contention that granting the requested accommodations would cause an undue hardship" under the ADA. 573 F. Supp. 3d at 423-24, 437. The court's reasoning in *Together Employees* applies equally here. There, the court found an undue hardship where a declaration from an epidemiologist concluded that vaccine exemption or alternative accommodations would increase the risk of COVID-19 infection and undermine the defendant's ability to protect patients and staff. *Id.* at 435. The court also held that the hardship was not a hypothetical, as the defendant "is entitled to manage the risk of infectious disease as best it can" and can best decide how to operate its business, balance competing interests, and respond to staffing issues related to accommodations. *Id.* at 436-37. The court also rejected the plaintiffs' argument that there was no undue hardship because the defendant granted accommodation requests of other employees on the grounds that the plaintiff failed to show why those requests were granted, and what accommodations were provided to those employees. *Id.* at 437.

The court in *Coggin v. Medline Industries, Inc.* likewise granted the defendant's summary judgment motion on the plaintiff's disability discrimination claim, finding an accommodation would have posed an undue hardship. 749 F. Supp. 3d 960, 965 (N.D. Ill. 2024), *dismissed*, Civ. No. 24-2757, 2024 WL 5497997 (7th Cir. Dec. 13, 2024). The court held that the plaintiff did not dispute the threats posed by COVID-19, including the risks healthcare workers faced from COVID-19 infection and the likelihood of transmitting the virus to patients, as well as the high risk for patients in the defendant's facilities—where the plaintiff worked—if they contracted the illness. *Id.* at 966. The court explained that "[t]he ADA did not require [the defendant] to expose

its customers' patients and staff to these risks, nor did it require [the defendant] to put its reputation on the line by doing so. [The defendant] was therefore justified in rejecting [the plaintiff's] proposed accommodation to continue working in her role unvaccinated." *Id.* (internal citations omitted). Here, Defendant raises many of the same arguments raised in *Together Employees* and *Coggin* for why granting Plaintiff's accommodation would have posed an undue hardship, which are supported by the unrebutted expert opinion of Dr. Salmon as well as evidence regarding Defendant's contemporaneous considerations for Plaintiff's accommodation requests. (*See supra* Section III.A.1.) While Plaintiff also argues that granting her accommodation would not have posed an undue hardship because Defendant accommodated other employees, the court in *Together Employees* rejected that argument in the context of disability discrimination where, as here, the plaintiff failed to provide any evidence as to why those accommodations were provided, what specific accommodations were provided, and whether the plaintiff was employed in a similar position as those employees. 573 F. Supp. 3d at 437.

While "undue hardship" in the disability discrimination context may require more than in the religious discrimination context, *see Prise*, 657 F. Supp. 2d at 599; *Hall*, 749 F. Supp. 3d at 547, Plaintiff has not established any factual dispute that granting her accommodation would have imposed an undue hardship on Defendant. *Gould*, 2025 WL 1165847, at *9; *Stewart*, 274 F. Supp. 3d at 263. As such, summary judgment on Plaintiff's NJLAD disability discrimination claim must be granted in Defendant's favor.

**C. Intentional and Negligent Infliction of Emotional Distress (Counts Five and Six)**

Plaintiff also brings claims for intentional and negligent infliction of emotional distress. (ECF No. 1 ¶¶ 50-62.) Defendant argues that it is entitled to summary judgment on these tort claims and that they must be dismissed because "supplementary common law causes of action may

not go to the jury when a statutory remedy under the [NJ]LAD exists." (ECF No. 33 at 31 (quoting *Catalane v. Gilian Instrument Corp.*, 638 A.2d 1341, 1349 (N.J. Super. Ct. App. Div. 1994)).) In the alternative, Defendant argues that even if the Court considers the merits of these claims, there is no evidence establishing the required elements for either claim. (*Id.* at 31-32.) Plaintiff does not respond to Defendant's argument that her tort claims are preempted by the NJLAD and instead argues that whether she satisfied the elements of these claims is a question for the jury. (ECF No. 40 at 21-22.)

The NJLAD is intended to "to encompass all those claims and damages previously available at common law" and as such, it provides the exclusive remedy for common law claims based on the same facts. *Bull v. Target Corp.*, Civ. No. 14-6838, 2015 WL 1266792, at *3 (D.N.J. Mar. 17, 2015) (citation modified); *see also Hamarneh v. United Airlines*, Civ. No. 24-5962, 2026 WL 183764, at *9 (D.N.J. Jan. 23, 2026) ("[T]he NJLAD preempts any supplemental common law tort action that is based on the same factual predicate. Accordingly, courts in this District routinely dismiss common law claims (such as IIED) based on the same facts as an NJLAD claim." (citation modified)); *Belfort v. Morgan Props., LLC*, Civ. No. 16-05207, 2018 WL 3201787, at *10-11 (D.N.J. June 29, 2018) (granting summary judgment against the plaintiff on his IIED claim because "the NJLAD preempts common law claims that are (1) based on the same factual predicates and (2) seek the same relief as a plaintiff's NJLAD claim."). Tort claims are preempted even where a plaintiff's NJLAD claim fails. *Rosario v. Cacace*, 767 A.2d 1023, 1030 (N.J. Super. Ct. App. Div. 2001) (affirming summary judgment for defendant where the plaintiff brought an NJLAD and IIED claim, and explaining "[t]hat [the IIED] claim, however, is based on the very same allegations of conduct asserted to constitute disparate treatment under the [NJ]LAD. As

plaintiff is unable to make a *prima facie* case for unlawful discrimination, she is perforce unable to prevail on her claim for emotional distress damages based upon the same conduct").

Plaintiff's IIED and NIED claims here are based on the same factual predicates as her NJLAD claims for religious and disability discrimination. Plaintiff's NJLAD claims are based on Defendant's denials of her religious and medical accommodation requests, which is the same basis for her tort claims. (*Compare* ECF No. 1 ¶¶ 39-43 (religious discrimination claim) *and id.* ¶¶ 44-49 (disability discrimination claim), *with id.* ¶¶ 53, 56 (IIED claim, alleging that "[t]he Hospital unlawfully denied Ms. Hagen's requests for accommodation and coerced her to allow herself to be injected with a [COVID]-19 vaccine on the threat of losing her employment" and this conduct was "extreme and outrageous" as required for an IIED claim) *and id.* ¶¶ 60 (NIED claim, alleging that "Ms. Hagen experienced fright and emotional distress from the events outlined in this Complaint and while she was undergoing the injection under coercion. She feared that she would be injured by the shot").)[12] The NJLAD and tort claims each seek damages. (*Compare id.* ¶ 43 (religious discrimination claims) *and id.* ¶ 49 (disability discrimination claim), *with id.* ¶ 58 (IIED claim) *and id.* ¶ 62 (NIED claim).) Because these tort claims are based on the same factual predicates

[12] The Court also notes that where a plaintiff "does not allege [the plaintiff] witnessed the death of or serious injury to a close family member, or were placed in reasonable fear of immediate personal injury, [the plaintiff] fail[s] to state a claim for negligent infliction of emotional distress." *Van Tassel v. Ocean Cnty.*, Civ. No. 16-4761, 2017 WL 5565208, at *10 (D.N.J. Nov. 17, 2017). Furthermore, "the New Jersey [S]upreme [C]ourt has held that 'where negligence causes fright from a reasonable fear of immediate personal injury,' a plaintiff may recover damages for any resulting 'substantial bodily injury or sickness.' However, 'where fright does not cause *substantial* bodily injury or sickness, it is to be regarded as too lacking in seriousness and too speculative to warrant the imposition of liability.'" *Glenside W. Corp. v. Exxon Co., U.S.A., a Div. of Exxon Corp.*, 761 F. Supp. 1100, 1114 (D.N.J. 1991) (quoting *Falzone v. Busch,* 214 A.2d 12, 17 (N.J. 1965) (emphasis in original)). Plaintiff has not demonstrated such substantial bodily injury or sickness; indeed, it is undisputed that Plaintiff "never saw a psychiatrist or therapist," and "did not take any medication to specifically address her alleged emotional distress." (ECF No. 40-1 ¶¶ 72-73.)

and seek the same relief, they are preempted by Plaintiff's NJLAD claims. *Belfort*, 2018 WL 3201787, at *10-11; *see also Omojola v. Arc of Ocean Cnty.*, Civ. No. 19-20354, 2025 WL 3187378, at *13 (D.N.J. Nov. 14, 2025) (granting summary judgment on the plaintiff's tort claims including IIED and NIED because "[t]he same factual allegations support plaintiff's common law, Title VII, and NJLAD claims"). Further, where a plaintiff fails to address a preemption argument, "[t]his apparent waiver provides a second basis to dispose of plaintiff's claims." *Omojola*, 2025 WL 3187378, at *13. The Court need not proceed to consider Plaintiff's tort claims on the merits, and grants summary judgment for Defendant.

**D. Punitive Damages (Count Seven)**

Lastly, Defendant argues that Plaintiff is not entitled to punitive damages under NJLAD, because Plaintiff has not shown Defendant's upper management engaged in "egregious" conduct as the statute requires. (ECF No. 33 at 33-34.) Plaintiff opposes this argument, contending that the question of whether Defendant's conduct was especially egregious is a question for the jury. (ECF No. 40 at 22.) While the NJLAD allows for punitive damages, they should only be awarded in "'exceptional cases' where 'the wrongdoer's conduct is especially egregious.'" *Stewart v. Union Bd. of Educ.*, Civ. No. 13-00800, 2015 WL 5608099, at *10 (D.N.J. Sep. 23, 2015), *aff'd sub nom. Stewart v. Union Cnty. Bd. of Educ.*, 655 F. App'x 151 (3d Cir. 2016) (first quoting *Catalane*, 638 A.2d at 1354; then quoting *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 464 (N.J. 1993)). However, as the Court has granted summary judgment for Defendant on Plaintiff's NJLAD claims, "Plaintiff's plea for punitive damages is effectively denied." *Id.*

## IV. CONCLUSION

For the foregoing reasons, and other good cause shown, Defendant's Motion for Summary Judgment (ECF No. 33) is **GRANTED**. An appropriate Order follows.

Dated: September 28, 2026

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE